AMERICAN SAMOA GOVERNMENT, Plaintiff,

v.

ANISEKO TALIPOPE and FA`AMANU SIAOSI, Defendants.

High Court of American Samoa
Trial Division

CR No. 45-04
CR No. 46-04

November 12, 2004

Before KRUSE, Chief Justice, ATIULAGI, Associate Judge, and MAMEA, Associate Judge.

Counsel: For Plaintiff, Marcellus T. Uiagalelei, Assistant Attorney
General
For Defendants, Matt Pavelich, Assistant Public Defender

ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS

On June 28, 2004, police officers Keneti Lagai and Homer Pelesasa responded to a burglary complaint at the S&M store in the Village of Tafuna. Etemani Luteru ("Luteru"), a store security employee, was interviewed by police at the store, and then later at the police substation in Tafuna where he implicated himself as well as Defendant Talipope Aniseko ("Talipope") and Defendant Fa`amanu Siaosi ("Fa`amanu") in the burglary.

On June 29, 2004, officers picked up Fa`amanu and took him to the substation for questioning about whether he was present during the burglary. Fa`amanu was not given *Miranda* warnings at this time. Fa`amanu first indicated to the questioning officer that he knew nothing about the burglary. Questioning then ceased for approximately five minutes during which point Fa`amanu was urged to "tell the truth." Upon resumption of questioning, Fa`amanu changed his story, and confessed to involvement in the burglary. At this point, officers gave Fa`amanu his *Miranda* warnings, obtained a signed waiver of those rights, and received a post-warning written confession.

Talipope's circumstances are similar; he was subsequently picked up by the officers from his place of employment after Fa`amanu had given his statement and was also taken to the substation for questioning. Like Fa`amanu, Talipope was not given *Miranda* warnings at this time. During questioning, Talipope gave the officers an incriminating statement to the effect that he had some of the stolen merchandise at his home. At that point, the interview ceased and two officers were sent with Talipope to retrieve the mentioned merchandise. As it happened, Talipope took the accompanying officers on a wild goose chase and he eventually succeeded in fleeing from them. Nevertheless, on the

following day, July 1, 2004, Talipope, accompanied by his parents, returned to the substation on his own accord to submit a statement. On this occasion, the police first obtained from Talipope his signature to the standard advisement and waiver of rights form in accordance with the requirements of *Miranda*. After giving a written statement, Talipope was allowed to return home.

On August 16, 2004, Defendants were charged with felony stealing and burglary in the first degree. On September 28, 2004, counsel for Defendants moved to suppress the confessions made by Defendants both before and after the *Miranda* warnings were given. Having reviewed party submissions and having had the benefit of a hearing, we now grant in part and deny in part Defendants' motion.

## Discussion

In *Miranda v. Arizona*, the Supreme Court determined that when an individual is taken into custody, the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires that an individual be properly notified of the right to remain silent, the right to the presence of an attorney, and warned that anything he says can be used against him in a court of law. 384 U.S. 436, 478-79 (1966). Unless and until such warnings are given, and a knowing and intelligent waiver of them are demonstrated by the prosecution, no evidence obtained as a result of interrogation can be used against him. *Id.* at 479.

### I. Pre-Warning and Post-Warning Statements

In these matters, we find, taking into account the totality of circumstances, that both Defendants were in custody on June 30, 2004, at the time of their interrogation, thus warranting advisement of their *Miranda* rights. First, although the officers indicate that Fa`amanu and Talipope were merely being questioned about their knowledge of the burglary as potential witnesses, Luteru, the night watchman, had already implicated them in the crime. Thus, more than witnesses, the officers regarded Fa`amanu and Talipope as targets of interest at the time of questioning. Second, rather than questioning them in public or at their place of work, the officers took Fa`amanu and Talipope to the Tafuna police sub-station, placing them in a police atmosphere during interrogation. Finally, after each had denied involvement in the burglary, the officers nevertheless continued to question them, pressing them to "tell the truth." Consequently, while each of these factors in and of themselves are not determinative of custodial interrogation, we conclude that the overall environment was custodial in nature. *See, e.g., American Samoa Gov't v. Malota*, 5 A.S.R.2d 101, 105 (Trial Div. 1987) (finding custody in part because "the setting of the interrogation, as well as the interrogation itself, was designed not so much to elicit the

suspect's version of the situation as to elicit a confession to a preconceived police version.").

Satisfied that the Defendants were in custody and subject to interrogation at the time the statements were elicited, we find in Talipope's case that all statements that he had given to the officers on June 30, 2004, were obtained in violation of *Miranda*, and must therefore be suppressed.

In Fa`amanu's case, we find his situation to fall under our prior holding in *Malota* and the very recent holding by the Supreme Court in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601 (June 28, 2004).

In *Seibert*, defendant Seibert's mentally-ill son died in his sleep. *Id.* at 2605. Fearing charges of neglect, Seibert sought to conceal the circumstances of her son's death by setting fire to her home, leaving another unrelated mentally-ill teenager living with the family to die in the fire in order to avoid the appearance that her son had been left unattended. *Id.* Five days later, Seibert was arrested and taken to a police station where she was questioned for thirty to forty minutes without *Miranda* warnings. *Id.* at 2606. Only after Seibert admitted she knew the teenager would die in the fire, did officers give her *Miranda* warnings and obtain from her a signed waiver of rights. *Id.* The officers then urged Seibert to repeat her pre-warning confession, which she did. Seibert moved to suppress both the pre-warning and post-warning statements, and the Supreme Court agreed that suppression was proper. *Id.*

We note, as did the *Seibert* Court, that *Miranda* seeks to address interrogation practices likely to disable an individual from making a free and rational choice about speaking. *Id.* at 2607. In turn, we find the Supreme Court's lengthy condemnation of the circumstances quite compelling in Fa`amanu's situation when it stated:

> it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. After all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the

police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 424, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

*Id.* at 2610-11. Whether the delay of *Miranda* warnings until post-confession was a conscious interrogation strategy or simply an inadvertent omission by the officers here involved, we need not judge. Nevertheless, as *Seibert* makes clear, the officers here involved clearly misunderstand *Miranda*. *Miranda* warnings are to be given at the outset of interrogation in order to give the putative defendant an informed choice as to whether or not to exercise those rights. As we stated in *Malota*, "[t]o advise someone . . . that he has a right against self-incrimination after the fact of incrimination is utterly without purpose." *Malota*, 5 A.S.R.2d at 105. Because the post-warning confession was "hopelessly tainted by the contemporaneity of occurrences, so that it may not be seen as the product of rational choice, and thus not voluntary," the custodial statements made by Fa`amanu should be properly suppressed also. *Id.*

## II. Talipope's Subsequent Statements

■ While we conclude that Talipope's initial statements made on June 30, 2004, are excludable, his subsequent statements upon return to the police station with his parents are admissible for the reason that such statements were not the fruit of the prior improper confession. Similar to *Wong Sun v. U.S.*, 371 U.S. 471, 491 (1963), Talipope was released from police custody only to return later voluntarily to make a statement. As in *Wong Sun*, we hold that the connection between the improper first confession and the later statements had "become so attenuated as to

dissipate the taint." *Id.* Therefore, his later statements are not excludable.

## Order

We conclude that, having failed to properly provide the Defendants with *Miranda* warnings upon initiation of custodial interrogation, the statements given by the Defendants, both before and, in Fa`amanu's case immediately after such warnings were given, should be suppressed. On the other hand, Talipope's statements independently provided upon his later voluntary visit to the police station are not suppressed.

It is so ordered.